Argued January 17, affirmed May 15, reconsideration denied July 26, petition for review denied September 8, 1978

STATE OF OREGON, *Respondent,*
*v.*
KENNETH EUGENE JOHANN, *Appellant.*
(No. C 76-06-08924, CA 8647)

578 P2d 810

Nely L. Johnson, Portland, argued the cause and filed the brief for appellant.

Donald L. Paillette, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Al J. Laue, Solicitor General, Salem.

Before Schwab, Chief Judge, and Lee, Richardson and Joseph, Judges.

SCHWAB, C. J.

**SCHWAB, C. J.**

Defendant was convicted after trial to the court of first degree rape (ORS 163.375) and two counts of first degree sodomy (ORS 163.405). His only assignment is that the trial court erred in admitting evidence of a "prior bad act."

The complainant's version was that defendant, a total stranger, knocked on her apartment door one evening, entered her apartment on the pretense of wanting a glass of water and then forced her to engage in varied sexual activity for the next couple of hours. The state called another woman who testified about an encounter with defendant on the street near the complainant's apartment building a few minutes before the charged incidents began:

"Q Calling your attention back to June 28 of last year, do you recall where you were living?

"A In Northwest Portland.

"Q Do you recall on that date where you were in the early evening hours, still light?

"A Walking over to Bob Waters' apartment.

"Q Do you recall approximately what time that was?

"A Sometime after 6:00 o'clock.

"Q And do you recall if anything unusual occurred as you walked towards his apartment?

"A Yes.

"Q Would you indicate what that is, please?

"A I got to about Hoyt, and a man came up to me and asked me if I had a match. And I said, 'No,' and I started walking faster, and he continued to follow me and asked me if I knew where a phone booth was. Again, I said, 'No.'

"* * * * *

"[H]e grabbed me and put his arm around me, and I tried to pull away, but he was very strong and I couldn't. And that was when he started talking very obscenely and foully and saying—first he asked me if I wanted to earn $20 by going to bed with him. And I said no. And then he just kept talking along in those lines and scared me very much. And I just kept walking. And then he grabbed me

[ 365 ]

harder and started kissing me there on the street. He stopped and kept walking; all this time I kept trying to pull away. And finally, we got to the apartment building. And I buzzed Bob. He was home. And he opened—he buzzed open the door from his upstairs apartment, and I got in. But the defendant got in the building, also.[1]

* * *

"Q  Had you ever seen him before?

"A  No.

"Q  Have you ever seen him again?

"A  No."

Defendant contends the above testimony impermissibly shows a "prior bad act" that was irrelevant to the issues at trial—since defendant conceded that sexual activity had occurred between him and the complainant—and that any relevance was outweighed by prejudice.

We are not certain that the testimony objected to revealed a *prior* bad act since it was so closely related to time and place of the crimes charged. But even assuming it was evidence of a prior bad act, for the reasons which follow we conclude it was nevertheless relevant to the issue of consent versus force.

Defendant did not testify. His version of the evening's events was introduced in the form of a tape-recorded interview between defendant and a police officer. Defendant repeatedly stated he did not remember many of the events in question, but in the process of claiming lack of memory repeatedly implied that the sexual activity had been consensual. Parts of the recorded interview are:

"[Defendant:] I don't remember meeting her. I don't know where I met her at.

"* * * * *

"I first said 'hello' to her; I don't know where I first saw her.

"* * * * *

---

[1]Other testimony established that the apartment building that the witness and defendant entered was the building in which the complainant lived.

"As far as taking her home or going home with her or walking her home, I don't remember at all anything about that.

"* * * * *

"[Officer:] Do you think you could have taken this girl sexually against her will?

"[Defendant:] No, she wouldn't have invited me home.

"[Officer:] She invited you home?

"[Defendant:] I think so. I mean, I guess that's how I got in there. I don't remember.

"* * * * *

"[Defendant:] I don't remember even going in the door with her.

"* * * * *.

"[Officer:] Is it possible you could have raped her but don't remember now?

"[Defendant:] No, it ain't possible because I wouldn't have done it. I wouldn't have raped her."

In arguing in summation that the sexual activity was consensual, defense counsel relied upon this recorded interview:

"I think the interview between Detective Rose and Mr. Johann points out—points to the Court the state of mind, Mr. Johann's state of mind at the time. He was intoxicated. He had blanks in his recollection. And the Court makes the decision whether at the time of the interview Mr. Johann was candid with the detective. And I would submit to you that he was candid; that he told the detective everything he remembered; that he, in fact, could not remember where he met the woman, how he met the woman. And the very sketchy things which he remembered, he stated to the detectives. But the one thing he stated clearly was that he did not force her to do anything against her will."

This reliance on defendant's denial that any force was involved, coupled with hints, suggestions and innuendos that defendant and the complainant had met elsewhere the evening in question, made the testimony of the other woman relevant to show the circumstances of defendant's entry into complainant's apartment building. It tended to corroborate the complainant's version that the events in question began

when a total stranger knocked on her door. It tended to refute the implication that complainant had invited defendant in after he walked her home.

Arguably, the other woman could have been restricted to testifying that defendant, unaccompanied by the complainant, followed her into the apartment building after her friend had buzzed the outer door open. But then the question might logically arise as to why the witness would have remembered seeing a stranger for one brief moment under uneventful circumstances. The testimony about the traumatic events that fixed the occurrence in the witness's memory was relevant to prevent the balance of her testimony from seeming "improbable or incredible." *State v. Remington,* 15 Or App 170, 172, 515 P2d 189 (1973), *rev den* (1974).

Affirmed.

**JOSEPH, J.,** dissenting.

In overruling defendant's objection the court commented:

"* * * This is the very night of the occurrence. It places him at the scene. It does that if nothing else. * * * The relevancy is it puts this man at the scene of the claimed rape, doesn't it?"

The record is clear, however, that the court did not limit its consideration of the testimony to the issue of defendant's presence at the scene.[1] Immediately before finding the defendant guilty the court said:

---

[1] Nor did the prosecution. The following is an excerpt from the district attorney's closing argument:

"And again, this is consistent with this man with what he said to [the complainant], with what he had done to [the other woman].

"I think that what he did to [the other woman] was important. It shows what his attitude was to women. He insulted her. He scared the heck out of her. I submit to the Court he did the same thing with [the complainant].

"[DEFENSE COUNSEL]: Your Honor, I would object to that type of argument. I had made an earlier objection that if the District

"* * * It is conceivable, I would think—and this is what concerns you—but I think it is conceivable that it could have been consensual. There are parts of the story of the victim which are difficult to understand, and we have gone over them and hashed them out * * *. They can be explained, but they are in my mind difficult in some ways to explain consistent with the person who has been placed by means of a threat, express or implied, in fear of immediate or future death or serious physical injury to herself.

"On the other hand, there are features of the case that certainly point in the other direction * * * which are impressive to me. The fact of his approach to the other lady * * * for sexual purposes. And certainly she was a believable witness. * * *"[2]

The challenged testimony was not necessary to prove defendant's presence at the scene. He was arrested in complainant's bed, as was shown in the prosecution's case. He admitted that he had sexual relations with complainant at the time and place alleged, and that was made known to the court at the beginning of the trial. Although the encounter with the other woman was closely related in time to the alleged crime, the omission of her testimony would not

---

Attorney is using that as a prior bad act to say that he did it once or that he did it before, he'll do it again, and that is the argument he is making, I have an objection to that.

"THE COURT: The objection is overruled.

"[PROSECUTOR]: That is so important because it is so close in time, what he's doing, and also the fact that he then goes to the apartments throughout the building. And I submit to the Court that he was doing the same thing or looking for the same thing in those apartments as he was looking for with [the other woman]."

[2] At the sentencing the court also commented:

"It is really a matter that when you have agonized over a decision like this case had and you waive a jury, and I have to decide this case, and I said at the time the conduct of the woman involved, if I were a woman and I were being forcibly raped, I don't know that I would act like that. But I am not a woman. We all forget that without doubt this man accosted another woman on the street, left there and went to this woman's apartment house where he didn't know her from Adam's off ox and forced his way into the apartment house or into her apartment. Now, the Court felt that was rather strong evidence. * * *.

have made the other evidence to be offered in the case seem "improbable or incredible." *State v. Remington,* 15 Or App 170, 172, 515 P2d 189 (1973), *rev den* (1974). Neither was the testimony necessary for a full understanding of the facts. *Compare State v. Hockings,* 29 Or App 139, 562 P2d 587, *rev den* (1977), *cert den* 434 US 1049 (1978). That the evidence was relevant to any other issue is not claimed, and it was obviously inadmissible to show a criminal disposition or propensity. *State v. Pitts,* 29 Or App 59, 562 P2d 562, 30 Or App 1, 566 P2d 182, *rev den* (1977).

Based upon the court's comments quoted above, I agree with defendant's assertion that the prejudicial effect of the testimony was substantial. Taking into account the absence of any need for the evidence in the light of the actual issues, *see State v. Lehmann,* 6 Or App 600, 488 P2d 1383 (1971), any remote probative value the testimony might have had was outweighed by its prejudicial effect, and it should have been excluded. *State v. Manrique,* 271 Or 201, 531 P2d 239 (1975).

The majority's reliance on the tape recorded interview in the police station is difficult to understand. In the first place, its admissibility and probative force is not in issue. In the second place, I believe that anyone who listens to the tape could only conclude that all it really shows is that the defendant was, as the old expression goes, "drunk as a billy goat," so drunk that his ability to have done the bizarre acts the purported victim testified to is extremely doubtful. In the third place, if the questions defendant was responding to were also quoted, it would be clear that the "hints, suggestions and innuendos" were made by the investigating officer, not by the defendant.

I would reverse.